UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TRACY SMITH | ) | CASE NO. 1:14CV633 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Tracy Smith Disability Insurance Benefits (DIB). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his November 30, 2012 decision in finding that Plaintiff was not disabled because he could perform his past relevant work as a packager and a plater (Tr.12-21). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

## I. PROCEDURAL HISTORY

Plaintiff, Tracy Smith, filed his application for DIB on September 28, 2010, alleging he became disabled on October 30, 2009 (Tr. 12, 160, 167, 206). Plaintiff's application was denied initially and on reconsideration (Tr. 91-94, 98-104). Plaintiff requested a hearing before an ALJ, and, on November 9, 2012, a hearing was held where Plaintiff appeared with counsel and testified before an ALJ, as did a vocational expert (VE).

1

On November 30, 2012, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr. 9-27).  Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 1-8).  Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g).

## II.     STATEMENT OF FACTS

Plaintiff was born on June 15, 1962, completed the twelfth grade, and has past work experience as an animal technician, cleaner, general laborer, and cable installer (Tr. 160, 210, 212, 217).  He stopped working in 2009, allegedly due to problems with his back, shoulder, epididymitis, nerves, and depression (Tr. 211).  In November 2010, he claimed difficulty dressing, bathing, using the toilet, lifting, standing, walking, sitting, climbing stairs, reaching, bending, and using his hands (Tr. 233, 236).

## III.    SUMMARY OF MEDICAL EVIDENCE

In October 2008, Plaintiff was seen in orthopedic consultation at the Veterans Administration Medical Center (VAMC) for left ulnar neuropathy (Tr. 908-909).  He was having numbness and tingling mainly in the left wrist into his smallest finger and half of his ring finger (Tr. 909).  He had recent onset of left shoulder pain, mostly with overhead activities, and some pain in his neck (Tr. 909).  An EMG revealed findings consistent with mild left ulnar mononeuropathy at the elbow and some slow conduction velocity of the right ulnar nerve across the elbow, but significant enough to be diagnosed as an entrapment neuropathy (Tr. 910-911).

Because of numbness and tingling in his lower extremities, Plaintiff underwent a lumbar MRI

2

in early 2009 (Tr. 851).  It revealed epidural lipomatosis at the L5-S1 nerve level, which his VAMC physician believed could potentially be causing his symptoms (Tr. 851, 918).

Plaintiff underwent a pain management consultation in March 2009 (Tr. 849-850).  At that time, he had low back pain radiating into his legs, tingling in both feet, neck pain and tingling in his left hand and arm (Tr. 849).  Examination revealed some diffuse sensory loss in the left lower extremity, some midline tenderness in the lower aspect of the cervical spine, and decreased sensation in the left hand mostly in the ulnar distribution, but over the median and radial nerves as well (Tr. 850). He was prescribed amitriptyline for his tingling symptoms (Tr. 850).

Plaintiff had a physical therapy consultation in April 2009, primarily due to sharp low back pain (8 out of 10 on a pain rating scale) radiating into his right leg (Tr. 847-849).  He was feeling weak with the recently-prescribed anti-depressant (Tr. 847).  Testing revealed decreased lumbar spine range of motion and strength, positive bilateral straight leg raising, and positive bilateral peroneal and ulnar nerve involvement (Tr. 849).

Plaintiff presented to the emergency department on March 10, 2010 with sharp left upper extremity and cervical pain (Tr. 331-336).  Examination of the cervical spine revealed some muscular tenderness (Tr. 331).  He was placed in a cervical collar, and given Naprosyn (Tr. 331).  He returned two weeks later with continued sharp left shoulder pain (Tr. 325-331).  He had difficulty with passive and active ranges of motion and tender trigger points over the right deltoid and posterior left shoulder (Tr. 325).  He was administered xylocaine/kenalog injections, and instructed to continue on anti-inflammatories and muscle relaxants (Tr. 325).  When seen for follow-up on March 29, 2010, Plaintiff noted no improvement since the injections (Tr. 322-324).  Examination showed painful cervical rotation bilaterally, tenderness to palpation over the cervical spine, the left subacromial area and left biceps tendon and pain with internal rotation, adduction, external rotation and empty-soda can test

3

of the left shoulder (Tr. 323). Shoulder x-rays were ordered, and he was referred to physical therapy (Tr. 323). X-rays were normal, and the physician noted that Plaintiff's shoulder pain was most likely related to a rotator cuff injury (Tr. 324).

Plaintiff attended physical therapy from April 22, 2010 through May 26, 2010 (Tr. 306-310, 312-319). No significant improvement was noted in his left shoulder pain with TENS treatment, but his pain level was decreased with hot moist packs treatment (Tr. 307). He was given cold and hot compresses, a Smart Support pillow, and exercises to continue treatment at home (Tr. 307).

On July 8, 2010, Plaintiff was seen in the emergency department with recent increased tingling and numbness in both feet and worsening low back pain over the last few weeks (Tr. 300-306). Mild muscle spasm was noted over his lumbosacral spine (Tr. 304).

Plaintiff was seen for a routine follow-up appointment on August 23, 2010 (Tr. 297-299). He was still experiencing numbness in his toes and fingers with hand-cramping over the past few months, as well as spinal and shoulder pain (Tr. 297).

Plaintiff presented to the emergency department on October 8, 2010 with chronic back and neck pain worse over the past week (Tr. 290-294). Examination revealed right and left paraspinal muscle tenderness (Tr. 290). He was given back exercises to perform at home, and prescribed Flexeril (Tr. 290).

State agency physician Esberdado Villanueva, M.D. reviewed the file on November 29, 2010, and concluded that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and occasionally climb ladders/ropes/scaffolds (Tr. 67-68). The opinion was affirmed by agency physician Willa Caldwell, M.D. on June 8, 2011 (Tr. 82-83).

Plaintiff was seen again in the emergency department on December 22, 2010 with recurrent bilateral testicular pain since sustaining testicular trauma while performing military exercises in 1990 (Tr. 404-414). A scrotal ultrasound revealed testicular and epididymal cysts (Tr. 370-371). He was given an intramuscular injection for pain relief, and given an antibiotic for orchitis (testicular inflammation) (Tr. 406-407, 411).

State agency psychologist Kenneth Gruenfeld, Psy.D. evaluated Plaintiff on January 17, 2011 (Tr. 363-367). Plaintiff reported worsening depression since 2008 with a history of suicide attempts in 2001 and 2005 (Tr. 364). He had problems with self-esteem, sadness, social isolation, fatigue, eating, sleeping, attention, focus, and concentration (Tr. 364). Dr. Gruenfeld concluded that Plaintiff suffered from major depressive disorder (mild, recurrent), and would be mildly impaired in relating to others, moderately impaired in his ability to maintain attention to performing routine tasks, and moderately impaired in his ability to withstand the stress and pressures associated with day-to-day work activities (Tr. 366).

State agency psychologist Vicki Warren, Ph.D. reviewed the file on February 1, 2011, and opined that Plaintiff would be moderately limited in his ability to maintain attention and concentration for extended periods, moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods, and moderately limited in his ability to respond appropriately to changes in the work setting (Tr. 68-70). This opinion was affirmed by state agency psychologist, Aracelis Rivera, Psy.D., on June 8, 2011 (Tr. 83-85).

Plaintiff went to the emergency department on February 22, 2011 with "pins and needles" tingling down both arms and up the back of his head (Tr. 394-401). Tenderness was noted over the C7 spinal process, and the attending physician believed the tingling was possibly related to cervical

5

radiculopathy (Tr. 399).  Plaintiff was given a trial of prednisone, and, if ineffective, told to consider a repeat cervical MRI (Tr. 399).  Six days later, he continued to have headaches and neck pain, and reported no relief from the prednisone dispensed in the emergency department (Tr. 394).

Plaintiff followed up with the VAMC primary clinic on March 23, 2011 (Tr. 389-393).  He was still having cervical pain, especially at night, headaches with range of motion and ongoing hand numbness (Tr. 390).  Examination revealed moderate paracervical and upper back tenderness on palpation and with range of motion (Tr. 391).  He was given a muscle relaxant and a non-steroidal anti-inflammatory for "polyarthralgia accompanied with myalgias" (Tr. 391).

Plaintiff returned to the emergency department on April 25, 2011 with another gradual onset of bilateral testicular pain and painful urination (Tr. 420-428).  He was again treated with an antibiotic for epididymitis (Tr. 426).

On May 26, 2011, Plaintiff underwent a physical therapy evaluation for cervical pain and bilateral upper extremity radiculopathy (Tr. 483-487).  It was noted that originally his bilateral upper extremity radiations followed the C8-T1 dermatomal pattern, however, now his radiations were throughout all his digits (Tr. 484).  He had been performing home exercises and using a therapeutic pillow previously recommended by the physical therapy department (Tr. 484).  He demonstrated decreased flexibility in his bilateral upper cervical extensors and upper trapezoids, weak middle and lower trapezius musculature, weak deep cervical flexors, difficult cervical ranges of motion with increased bilateral upper trapezius pain (Tr. 486).  He was discharged from physical therapy on July 6, 2011, after reaching his maximal functional potential, with the goal to decrease cervical pain only "partially met" (Tr. 456, 473-476, 480-483, 885).  The physical therapist opined that Plaintiff may need to have his symptoms medically managed, and that he may benefit from continued pain management care (Tr. 476).  He was instructed to obtain an updated MRI prior to a pain management

consultation (Tr. 476).

A cervical MRI from July 30, 2011 showed degenerative changes, causing mild left foramina stenosis at C4-C5 and C6-C7, and mild right foramina stenosis at C5-C6 (Tr. 468-469). A mass over the central aspect of the C4-C5 level was suggestive of a small syrinx/focal hydromyelia, but needed correlation with a post-contrast study (Tr. 469). The post-contrast study confirmed a central non-enhancing lesion within the cord at the C4-C5 level due to syringomyelia (Tr. 488).

Plaintiff was seen in the urologic surgery department at MetroHealth Medical Center (MHMC) on September 20, 2011 for testicular and abdominal pain associated with weak stream (Tr. 555-562). Based on his symptoms and flow stream study consistent with prostatitis, the urologist recommended Plaintiff begin a trial of Flomax (Tr. 558).

On October 4, 2011, Plaintiff returned to the VAMC for chronic pain management consultation with Ramsey N. Saad, M.D. (Tr. 527-532). Plaintiff reported primarily neck and left upper extremity pain associated with numbness in the left arm and "dropping things," due to left hand weakness (Tr. 527-528). The pain starts in the posterior aspect of his neck, and radiates to the medial aspect of his left upper extremity to his ring and middle fingers (Tr. 528). He was obtaining minimal pain relief with naproxen, and some pain relief with Flexeril (Tr. 528). After examination and review of the most recent MRI, Dr. Saad recommended Plaintiff be seen by a neurosurgeon to further evaluate the syringomyelia at C4-C5, in light of the progression of left hand weakness, advised him to hold off using naproxen, and added a low dose of gabapentin (Tr. 531).

Plaintiff presented to the VAMC for routine follow-up on October 13, 2011, stating that he had been getting more lipomas (Tr. 522-527). One on the inner side of his left biceps/triceps area seemed to cause him tingling in the ulnar area of his left hand when pressure was applied (Tr. 525). Plaintiff was encouraged to discuss the lipoma at an upcoming neurosurgery appointment (Tr. 526).

Plaintiff was seen in the medical clinic at MHMC to establish care for lipomas, osteoarthritis, epididymitis and syringomyelia presenting with right lower quadrant pain, back pain, and difficulty urinating (Tr. 574-579). The attending physician noted diffuse lipomas on both his upper and lower extremities and bilateral tingling of both hands on examination (Tr. 576). Plaintiff was given another prescription for Flomax, and referred for a neurosurgery consultation (Tr. 577).

At his neurosurgery consultation with Andreas Tomac, M.D., Plaintiff presented with left arm numbness and neck pain of a couple years' duration and worsening over the past seven months (Tr. 584). He described his symptoms as aching and burning along the inner aspect of his left arm, including the fourth and fifth digits, and tingling at the back of his head associated with headaches (Tr. 584). He had some weakness in his left hand opening jars, and recently had some tingling in the tips of the digits of his right hand (Tr. 584). His hand symptoms and neck pain were not adequately controlled with gabapentin, acetaminophen, or muscle relaxants (Tr. 584). Examination revealed moderate tenderness to palpation around his lower posterior neck, several non-tender soft-tissue lumps scattered around both his upper arms and legs, and diminished sensation to light touch along the medial aspect of his left arm (Tr. 585). Dr. Tomac believed Plaintiff's numbness was unlikely due to the syrinx, but was more consistent with nerve impingement distal to the nerve root, and felt that neurology should assess him for the presence of possible neurofibromas (Tr. 585). Dr. Tomac did not believe surgery would alleviate his symptoms (Tr. 585).

Due to a positive toxicology screen, Plaintiff was referred for a psychiatric assessment on November 7, 2011 (Tr. 499-513, 516-520). Plaintiff reported having used cocaine right before his appointment with Dr. Saad, but stated he had not used any since starting gabapentin (Tr. 521). The psychologist did not see any indications of anxiety or depression (or more severe mental disorders) that would require mental health treatment (Tr. 512). Since Plaintiff denied ongoing abuse of drugs,

it was recommended he enter the VA's early intervention program (Tr. 512).

Kutaiba Tabbaa, M.D., with MHMC pain management, examined Plaintiff on November 9, 2011 for bilateral testicular pain, which he described as pinching, sharp and episodic, and relieved by nothing (Tr. 596-598). Plaintiff estimated he could stand for ten minutes, sit for ten minutes, and walk for ten minutes, and rated his pain as a "7" (Tr. 596). Dr. Tabbaa's assessment included diagnoses of syringomyelia, urinary retention, orchitis and epididymitis and testicular pain, and he prescribed a "tramadol cocktail" and Elavil (Tr. 598).

Plaintiff was evaluated by MHMC neurologist Marc Winkelman, M.D. on November 16, 2011 (Tr. 609-612). Plaintiff reported numbness in both hands into his fourth and fifth fingers, and in his legs and feet when sitting (Tr. 609). Examination revealed tinel sign at the left elbow and reduced sensation (to pinprick and light touch) in the left hand (Tr. 612). Dr. Winkelman opined that Plaintiff's tingling in the ulnar territory of his hands (with tinel sign and sensory loss in the left hand) suggested ulnar nerve lesions, but he could not correlate any neurologic findings to the tingling in his legs (Tr. 612). The Doctor ordered an EMG of Plaintiff's bilateral upper extremities (Tr. 612). On December 23, 2011, Dr. Winkelman reported that the EMG showed left ulnar mononeuropathy, demyelinative, at the elbow (Tr. 657). The Doctor recommended Plaintiff avoid leaning on his left elbow, and sleep with his elbow extended (Tr. 657).

Another EMG from the VAMC laboratory, performed on January 3, 2012, revealed evidence of right ulnar neuropathy at or about the elbow, which represented a change when compared to a previous normal study from October 2009 (Tr. 631).

Dr. Tabbaa saw Plaintiff in January 2012 for unchanged scrotal pain, as well as low back pain radiating to his lower extremity (Tr. 642-643, 649-651). Dr. Tabbaa recommended Plaintiff continue with the tramadol cocktail, Elavil, and Neurontin (gabapentin), urged him to follow up with urology,

9

and administered a caudal epidural steroid injection (Tr. 642-643, 650-651).

Plaintiff was examined in the VAMC urology department on February 15, 2012 for painful bilateral scrotal cysts increasing in size (as confirmed by an ultrasound of January 3, 2012) (Tr. 618-619, 664-665). Examination revealed small scrotal cysts with discomfort on palpation (Tr. 664). The Doctor recommended Plaintiff continue using an anti-inflammatory for discomfort, and discouraged surgical intervention (Tr. 665).

On February 16, 2012, Dr. Tabbaa noted that Plaintiff's pain was unchanged (Tr. 721-723). Dr. Tabbaa increased the dosage of amitriptyline, and ordered additional caudal epidural steroid injections (Tr. 723).

Dr. Winkelman reported on March 2, 2012 that Plaintiff was having more pain in his left elbow, with the same amount of hand numbness and weakness (Tr. 717-720). The Doctor found that Plaintiff's left ulnar nerve lesion was stable, and that his elbow pain may be related, but thought surgery was not indicated (Tr. 719). Dr. Winkelman stated that Plaintiff should be treated for his pain by his pain management doctor (Tr. 720).

Plaintiff underwent another caudal epidural steroid injection on March 7, 2012, administered by Dr. Tabbaa (Tr. 713-715).

On May 1, 2012, Plaintiff returned to the VAMC pain management clinic for an examination with Kenneth Moss, M.D., with neck pain increased with left cervical rotation and testicular pain (Tr. 786-787). Examination revealed some guarding with diminished left cervical rotation, left upper trapezius tenderness and left paravertebral tenderness (Tr. 787). Dr. Moss reiterated his opinion that surgery was not a viable treatment option (Tr. 787).

On July 2, 2012, when examined by Dr. Winkelman, Plaintiff noted worsening tingling and pain associated with his left elbow, with additional pain in his left shoulder and arm (Tr. 788-790).

Dr. Winkelman found positive Tinel's sign at the left elbow, reported that the left ulnar nerve lesion was stable, and recommended Plaintiff follow up with his primary care physician for his left shoulder pain (Tr. 790).

A VAMC disability benefits questionnaire was completed by Nurse Practitioner Judith Reed on July 11, 2012 regarding Plaintiff's back condition (Tr. 773-784). Ms. Reed opined that Plaintiff's spine condition would impact on his ability to perform strenuous work involving lifting, bending, and prolonged standing (Tr. 783).

Plaintiff presented to the VAMC emergency department on August 8, 2012 with "pins and needles" tingling down his left arm, and pain in his left upper back unrelieved by medications (Tr. 743-750). Examination revealed pain on palpation and spasm over the left trapezius area, and it was believed that Plaintiff's symptoms were possibly related to cervical radiculopathy (Tr. 745). He was given a trial prednisone burst and Flexeril (Tr. 745).

Plaintiff returned to the emergency department on August 29, 2012 with persistent left shoulder pain and numbness and tingling in the last three digits of his hand (Tr. 729-733). A left shoulder x-ray revealed some inferior gland spurring (Tr. 726). The attending physician ordered a "gabapentin up-titration" schedule to treat Plaintiff's ulnar neuropathy (Tr. 729).

### IV.     SUMMARY OF TESTIMONY

Plaintiff testified that he was last employed at Seneca Solutions in 2009, performing masonry work (Tr. 36). Earnings posted to his record in 2010 represented back pay he was due from Seneca Solutions (Tr. 36). He has constant pain in his low back, shoulders, neck, arms, and testicles (Tr. 40). The pain is usually at a 7 out of 10, and is increased with standing, walking, bending, and lifting (Tr. 41). He estimated he could stand for about ten to fifteen minutes, walk for about ten to fifteen

minutes, and lift about ten pounds without pain (Tr. 41-42). He experiences weakness and numbness in his arms and hands, and tends to drop things (e.g., a glass of water) (Tr. 44). Plaintiff testified that the medications he takes (Neurontin, tramadol, and ibuprofen) do not really help and also make him tired (Tr. 41, 43, 50). He lives with his sister, who takes care of most of the household chores (i.e., laundry, sweeping, mopping) (Tr. 46). He makes himself microwaveable meals, and occasionally grocery shops (while leaning on the cart) with his sister (Tr. 47). He spends most of his days watching television, and is most comfortable lying on his back (which he estimated he does about twelve hours a day) (Tr. 49, 53). He has tried physical therapy, which did not provide him any pain relief, and also has undergone injections, which provided him only very temporary relief (Tr. 48-49).

The Vocational Expert (VE) testified that Plaintiff has past work experience as a plater doing production assembly (DOT 706.687-010), a hand packager (DOT 559.687-074), an animal caretaker (DOT 410.674-010), a construction laborer (DOT 869.687-026), and a phone cable installer (DOT 821.281-010) (Tr. 55). The ALJ posed the following hypothetical to the VE: assume an individual of Plaintiff's age, education and work history able to lift and carry twenty pounds occasionally, ten pounds frequently; able to stand and/or walk for a total of about six hours in an eight-hour day with normal breaks; sit for a total of about six hours in an eight-hour day with normal breaks; not retaining the ability to climb items such as ladders or scaffolds or crawl, but could occasionally use ramps or stairs, stoop, kneel, crouch; could not engage in lifting or reaching overhead; could frequently grasp, handle, and then finger; would be limited to jobs that involve understanding, remembering and following simple instructions and directions in work settings with only occasional changes in the day-to-day work routine, jobs that involve only occasional contact with others to perform the job duties and no jobs that involve adherence to strict production quotas (Tr. 56). The VE testified that the hypothetical individual could perform Plaintiff's past work as a hand packager and a plater (Tr. 56).

If the same individual were instead limited to lifting and carrying ten pounds occasionally and less than ten pounds frequently and standing and walking to a total of about two hours in an eight-hour day with normal breaks, the VE responded that he could not perform any of Plaintiff's past work, but could perform sedentary jobs as a circuit board tester (DOT 726.684-110), an eyeglass assembler (DOT 713.684-038), and a sorter (DOT 669.687-014) (Tr. 58).  In a third hypothetical, the ALJ asked the VE to assume that the same individual from the second hypothetical with the additional factor that he was limited to occasionally grasping, handling and fingering with the non-dominant arm and hand (Tr. 58).  The VE responded that there would be no sedentary work available, as frequent use of the upper extremities bilaterally is generally required (Tr. 58).  The VE stated that his testimony was consistent with the *Dictionary of Occupational Titles* and the *Selected Characteristics of Occupations* (Tr. 59).

### V.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c)and 416.920(c)(1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d)  and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

13

> 5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole.

14

*See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

## **VII.  ANALYSIS**

Plaintiff asserts two assignments of error:

A. THE ALJ'S FINDING THAT PLAINTIFF CAN PERFORM FREQUENT GRASPING, HANDLING AND FINGERING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

B. THE ALJ DID NOT FULFILL HIS DUTY TO RESOLVE CONFLICTS BETWEEN THE DICTIONARY OF OCCUPATIONAL TITLES AND THE VE'S TESTIMONY.

In his decision, the ALJ acknowledged that Plaintiff's peripheral neuropathy was a severe impairment that impacted his ability to perform basic work activities (Tr. 14). The ALJ also considered Plaintiff's assertion that he had pain in his hands that limited his range of motion and made him weak (Tr. 18). Based on his review of the evidence as a whole, the ALJ correctly found that Plaintiff's neuropathy was limiting, but it was not disabling (Tr. 17-20). Specifically, the ALJ concluded that Plaintiff's neuropathy restricted him to frequent grasping, handling, and fingering (Tr. 17). Substantial evidence supports that decision, and Plaintiff's complaints to the contrary lack merit.

No medical opinion suggested that Plaintiff's neuropathy was disabling. In fact, Plaintiff's own treating physician, Dr. Saad, told Plaintiff that he did not get involved in disability matters, and imposed no physical limitations (Tr. 531). The only doctors who issued opinions on Plaintiff's physical impairments were reviewing physicians, Drs. Villaneuva and Caldwell, who found that Plaintiff could perform medium work with no manipulative limitations (Tr. 19-20, 67-73, 82-83). Substantial evidence supports the ALJ's conclusion that Plaintiff could perform frequent grasping (Tr. 17).

Next, Plaintiff argues that the ALJ should have addressed certain medical evidence relating to Plaintiff's neuropathy in his decision. But an ALJ is "not required to analyze the relevance of each

15

piece of evidence individually. Instead, the regulations state that the decision must contain only 'the findings of facts and the reasons for the decision.'" *Bailey v. Comm'r of Soc. Sec.*, 413 F.App'x 853, 855 (6th Cir. 2011) (quoting 20 C.F.R. Section 404.953). In his decision, the ALJ considered Plaintiff's hand pain, noted that nerve block injections helped his symptoms, and that a special pillow also helped his pain (Tr. 18). Furthermore, the ALJ also considered the fact that Plaintiff did not follow through with physical therapy, and did not receive other treatment for his hand-related symptoms, which suggested that they did not rise to a disabling level.

In accordance with the regulations, the ALJ has the final responsibility for deciding how an impairment resulted in work-related limitations. 20 C.F.R. Section 404.1564(c). In accordance with the regulations, the ALJ is responsible for evaluating the factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony." *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio, Mar. 2, 2010), SSR 96-5p. In this instance, the ALJ correctly concluded that Plaintiff's neuropathy resulted in work-related limitations, but it was not disabling. Hence, substantial evidence supports the conclusion that Plaintiff could perform frequent grasping, handling, and fingering.

At the hearing, the VE testified that a hypothetical individual with Plaintiff's RFC could perform his past relevant work as a plater and a sorter (Tr. 20, 56). Upon questioning the VE, the ALJ confirmed that the VE's testimony was consistent with the *Dictionary of Occupational Titles* (DOT) (Tr. 59). Plaintiff complains that the ALJ's opinion contravenes Social Security Ruling 00-4p because the jobs that the VE identified were inconsistent with the DOT (Pl. Br. 20-23; Tr. 35-36, 714-718).

However, the undersigned concludes that the ALJ's decision was in compliance with Social Security Ruling 00-4p because he confirmed that the VE's testimony was consistent with the DOT (Tr. 59). *See,* SSR 00-4p, 2000 WL 1898704, at * 2-4. "Nothing in SSR 00-4p places an affirmative duty to conduct an independent investigation into the testimony of the witnesses to determine if they are

16

correct." *Martin v. Comm'r of Soc. Sec.*, 179 F.App'x 369, 374 (6th Cir. 2006). *Ledford v. Astrue*, 311 F.App'x 746, 757 (6th Cir. 2008). Therefore, the ALJ correctly relied on the VE testimony in finding Plaintiff not disabled, and his decision is affirmed. *Id.*

The ALJ asked a hypothetical question to the VE that incorporated all of Plaintiff's limitations that the ALJ found supported by the record. Hence, the ALJ correctly relied upon the VE's testimony in finding that Plaintiff could perform his past relevant work. The VE's testimony concerning the availability of suitable work was based upon substantial evidence, since the testimony is in response to a hypothetical question that accurately described plaintiff's physical and mental impairments." *Smith v. Halter,* 307 F.3d 377, 378 (6th Cir. 2001). Thus, the ALJ did not commit error in the weight he gave to the evidence, and the decision that Plaintiff was not disabled is based upon substantial evidence. The ALJ complied with his obligation under SSR 00-4p.

### **IX.** **CONCLUSION**

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform his past relevant work as a packager and plater, and, therefore, was not disabled. Hence, he is not entitled to DIB.

Dated: March 13, 2015         */s/George J. Limbert*
                              GEORGE J. LIMBERT
                              UNITED STATES MAGISTRATE JUDGE